IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JANE L. BERG,                              )
                                           )
                 Plaintiff,                )
                                           )
     v.                                    )     Civil Action No. 1:18cv0294 (JFA)
                                           )
NANCY A. BERRYHILL,                        )
*Acting Commissioner of Social Security,*  )
                                           )
                 Defendant.                )
_____)

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment. Plaintiff seeks

judicial review of the final decision of Nancy A. Berryhill, Acting Commissioner of the Social

Security Administration ("Commissioner"), denying plaintiff's claim for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The

Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ")

and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council")

that plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

On June 21, 2018, plaintiff filed a motion for summary judgment (Docket no. 13) along

with a brief in support (Docket no. 14). On July 5, 2018, the Commissioner filed a cross-motion

for summary judgment (Docket no. 16) along with a memorandum in support (Docket no. 17).

Plaintiff did not file an opposition to the Commissioner's motion for summary judgment. For the

reasons set forth below, the plaintiff's motion for summary judgment (Docket no. 13) will be

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5
and 7(C). (Docket no. 9). In accordance with those rules, this opinion excludes any personal identifiers such as
plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's
medical information is limited to the extent necessary to analyze the case.

denied; the Commissioner's motion for summary judgment (Docket no. 16) will be granted; and the final decision of the Commissioner will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff filed concurrent applications for DIB and SSI on March 21, 2013, with an alleged onset date of May 1, 2010. (AR 207–16). Those applications were denied in February 2014. (AR 80). Plaintiff then protectively filed concurrent applications for DIB and SSI on November 5, 2014, with an alleged onset date of May 1, 2011.[2] (AR 217–18, 221–228). The Social Security Administration informally denied plaintiff's claim for SSI on December 15, 2014, citing plaintiff's failure to appear at an appointment to discuss eligibility. (AR 114–15). The Social Security Administration initially denied plaintiff's claim for DIB on January 7, 2015. (AR 79–88). On January 14, 2015, plaintiff submitted a request for reconsideration. (AR 121). The Social Security Administration again informally denied plaintiff's claim for SSI on April 6, 2015, citing plaintiff's claim that she did not want to file a claim for SSI. (AR 122–23). On April 13, 2015, plaintiff filed a formal claim for SSI. (AR 223–28). On June 1, 2015, the Social Security Administration denied plaintiff's claims for DIB and SSI on reconsideration. (AR 90–113). After these notices of denial, on July 9, 2015, plaintiff requested a hearing before an ALJ. (AR 132–34). On July 21, 2016, the Office of Disability Adjudication and Review ("ODAR") acknowledged plaintiff's request for hearing and notified plaintiff of the option to hold the hearing by video conference. (AR 140–54). On August 9, 2016, plaintiff's representative submitted a dire need request seeking to expedite the scheduling of plaintiff's hearing. (AR

---

[2] In her protective application, plaintiff stated that her alleged onset date was September 1, 2013. (AR 217, 221, 223). However, plaintiff stated that her alleged onset date was May 1, 2011 in her disability report filed on November 12, 2014. (AR 300-09). Moreover, the Social Security Administration cited an alleged onset date of May 1, 2011 (AR 79, 90, 101), as did the ALJ in his decision (AR 12). Plaintiff's representative, Andrew G. Mathis, also claimed an alleged onset date of May 1, 2011 in correspondence to the Appeals Council. (AR 347).

158). On January 11, 2017, ODAR notified plaintiff that a hearing was scheduled for February 2, 2017. (AR 170–97).

On February 2, 2017, ALJ Michael A. Krasnow held a hearing in Washington, D.C., and plaintiff appeared with her representative, Andrew G. Mathis.[3] (AR 32–78). On May 30, 2017, the ALJ issued a decision denying plaintiff's claims for DIB and SSI under the Social Security Act. (AR 9–31). In reaching his decision, the ALJ concluded that plaintiff was not disabled under either Title II (sections 216(i) and 223(d)) or Title XVI (section 1614(a)(3)(A)) of the Social Security Act. (AR 25). On June 12, 2017, plaintiff's representative sent a letter to the Appeals Council requesting a review of the ALJ's decision. (AR 205–06, 357). On January 29, 2018, the Appeals Council denied plaintiff's request for appeal. (AR 1–5). As a result, the decision rendered by the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On March 16, 2018, plaintiff filed a complaint in the U.S. District Court for the Eastern District of Virginia, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket no. 20). This case is now before the court on cross-motions for summary judgment. (Docket nos. 13, 16).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[3] Plaintiff appointed Mr. Mathis as her representative on July 9, 2015. (AR 8).

*Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The duty to resolve conflicts in the evidence rests with the ALJ, not the reviewing court, and the ALJ's decision must be sustained if it is supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### III. FACTUAL BACKGROUND

#### A. Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1981 (AR 221) and was 35 years old at the time of the ALJ hearing (AR 36). Plaintiff graduated from high school in June 2000, attended one year of college before dropping out, and obtained a certificate as a professional receptionist in July 2005. (AR 37–38, 305, 447). Plaintiff testified that she was enrolled in special education classes during school, though she stated in her disability report that she did not attend special education classes. (AR 37, 305). Plaintiff worked as a pharmacy clerk from October 2000 to March 2001 at Giant Food. (AR 232, 267). For six months in 2001, plaintiff worked in medical records at Massachusetts Peer Review. (AR 232, 358). Plaintiff then worked at CVS from August 2002 to January 2009 as a cashier, where she did "a little bit of everything." (AR 41, 232–33, 267). During the hearing, plaintiff testified that she was fired from her position for selling alcohol to a minor. (AR 40–41). From August 2009 to May 2011, plaintiff worked at the Ashburn Children's Center as an after-school teacher. (AR 233, 267, 305). Plaintiff also worked at the Bonefish Grill for one week in September 2014 as a silverware roller and testified that she left that job because she

4

was doing her work too slowly. (AR 39–40, 234, 305). In the hearing decision, the ALJ found that plaintiff's work at the Bonefish Grill did not rise to the level of substantial gainful activity, and that plaintiff had not engaged in substantially gainful activity since May 1, 2011. (AR 14).

## B.    Summary of Plaintiff's Medical History Prior to Her Alleged Disability Date[4]

A review of the record indicates that plaintiff does not have a significant relevant medical history prior to her alleged disability date. The only noteworthy visit was a psychological evaluation conducted on August 28, 2007 by Dr. David Hebda. (AR 358–68). Dr. Hebda, a licensed clinical psychologist and neuropsychologist, examined plaintiff on a referral from the Department of Rehabilitative Services seeking diagnostic clarification and a profile of plaintiff's cognitive and emotional strengths and limitations as they related to vocational planning. (AR 358). Dr. Hebda noted that plaintiff's medical history was positive for obsessive-compulsive disorder ("OCD"), which was "getting better" as a result of medication, then worsened when plaintiff stopped taking her medication, and then significantly improved following six months of behavioral therapy. (AR 359). Plaintiff was observed to be pleasant, alert, and cooperative; easily engaged in conversation; accepted moderate levels of challenge; and had no evidence of impulsive behaviors. (*Id.*). Dr. Hebda conducted a variety of assessments to evaluate plaintiff, including a clinical interview, Personality Assessment Inventory, Trail Making Tests A&B, Wechsler Adult Intelligence Scale–III, Wender-Utah Rating Scale, and Wide Range Achievement Test—Revision 4. (*Id.*). The academic skills testing was within normal limits except for plaintiff's arithmetic ability, leading Dr. Hebda to find that plaintiff had a specific learning disability in mathematics. (AR 361). Dr. Hebda also found that plaintiff's interpersonal style was warm, friendly, and sympathetic. (AR 363). Dr. Hebda concluded that plaintiff's

---

[4] The AR contains approximately 1200 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of each and every medical treatment.

mental health issues were "subclinical," that her attentional deficits were sufficient to interfere with occupational pursuits, that plaintiff had borderline intellectual skills, and that plaintiff could benefit from a supported work setting. (AR 365).

### C.    Summary of Plaintiff's Medical History Following Her Alleged Disability Date (May 1, 2011)

On April 19, 2012, plaintiff underwent an occupational therapy driving evaluation at the Woodrow Wilson Rehabilitation Center. (AR 369–72). Clay Hule, her occupational therapist, found that plaintiff's visual/perceptual screening results were largely normal, as were her cognitive/behavioral observations. (AR 369–70). After conducting a test drive, Mr. Hule found that plaintiff was a questionable candidate for driving due to her difficulty with divided attention and processing speed. (AR 371). Mr. Hule also found that plaintiff was slow to show significant improvement and her anxiety level was very high, and concluded that plaintiff should be given an opportunity to pursue her license given that she showed some marginal improvement during her test drive, but reiterated her questionable potential for driving. (Id.).

On October 17, 2014, plaintiff voluntarily presented at the Arlington County Department of Human Services for a psychological assessment, stating that she wanted to "feel better, to get working again." (AR 441). Plaintiff stated that she had been diagnosed with depression in June 2014 and was experiencing symptoms including sadness, crying a lot, sleeping too much, feeling worthless/hopeless, thoughts of death, lack of interest in activities, difficulty making decisions, and irritability. (Id.). Plaintiff further stated that she had been crying most nights in the past week and experienced persistent sadness for most days over the past few months. (Id.). During her examination, Laura Brownsberger, LCSW, found that plaintiff was at moderate risk of self-harm due to passive suicidal ideation and that her community life functioning was moderately impaired. (AR 444–45). Ms. Brownsberger also found that plaintiff did not require help or

training in basic living skills on a continuous or intermittent basis, and appeared oriented, had affect appropriate to mood, had coherent thought content/processes, had normal speech, had fair/insight judgment, and had a GAF score of 52 upon admission. (AR 453, 461, 463). Ms. Brownsberger concluded by recommending that plaintiff seek individual therapy to address her diagnosis of Major Depression and psychiatric services to manage her symptoms. (AR 461–62).

On October 28, 2014, plaintiff returned for a follow up appointment and spoke with a therapist, stating that she hoped to be prescribed "something" to address her symptoms of depression, noting that she had been treated for OCD with Zoloft in the past. (AR 426, 479). Lisa Mohr, plaintiff's case manager, noted that plaintiff's grooming and hygiene were poor, as she appeared disheveled and as if she had not showered. (AR 426). Josette Millman, LNP, also noted that plaintiff had good eye contact, was cooperative but anxious, had an affect consistent with her mood, was alert, and had fair insight and judgment. (AR 480–81, 483). Ms. Millman also found that plaintiff had ruminative thoughts and was forgetful, experienced symptoms of paranoia, and experienced suicidal thought content, but did not form a plan to act on those thoughts. (AR 481–82, 484). Ms. Millman concluded that plaintiff may benefit from Celexa and Seroquel to address her anxiety, sleep issues, and distorted thoughts, and obtained plaintiff's consent for medication. (AR 484–85).

On November 3, 2014, plaintiff returned for an individual therapy session. (AR 427). Plaintiff again appeared disheveled, her speech was rapid and jumping from topic to topic, her affect and mood were congruent and depressed, and she exhibited poor insight/judgment; but she appeared oriented, reported no suicidal ideations or hallucinations/delusions, and had intact memory/concentration. (*Id.*). Plaintiff reported having a panic attack after seeing a piece of lint on her bathroom counter and that she was still obsessing over it during the appointment. (*Id.*).

Plaintiff continued to follow-up with the Arlington County Department of Human Services throughout November 2014. (AR 428–35). On November 5, 2014, plaintiff completed applications for vouchers for Seroquel and Celexa prescriptions. (AR 428). Ms. Mohr found that plaintiff was oriented, and that her grooming and hygiene were within normal limits. (AR 429). Ms. Mohr also found that plaintiff's thought process was organized and logical, that she reported no suicidal ideation or hallucinations/delusions, had intact memory and concentration, and had good insight/judgment; but had a congruent, paranoid affect and mood and remained hyper focused on the thought of ingesting particles in the air. (*Id.*). On November 14, 2014, plaintiff returned complaining of worsening symptoms, including intensifying fears regarding particles floating around in the air which she believed "will kill her." (AR 430). Plaintiff also stated that she was still not taking her medication, fearing that the medication would make her symptoms worse, and she was worried about lying to her manager about taking her medication. (*Id.*). Ms. Mohr observed that plaintiff's grooming and hygiene were again disheveled; she was inattentive; her affect and mood were congruent and depressed; and she was experiencing several symptoms including depression, paranoia, obsessive thinking, excessive spending, feelings of entitlement, sadness, irritability, and challenges with making decisions. (*Id.*). Ms. Mohr also found that plaintiff was oriented, did not have hallucinations or delusions during the session, had intact memory and concentration, and had fair insight/judgment. (*Id.*). Plaintiff verbally agreed to consider the benefits of medication. (*Id.*).

On November 20, 2014, plaintiff called Ms. Mohr complaining of abdominal pain. (AR 431). During the call, plaintiff again stated that she was not taking her medication, and had no intention of taking it. (*Id.*). Ms. Mohr noted that plaintiff was alert and that her thought process was organized and logical but her insight and judgment were poor. (*Id.*). Ms. Mohr also

suggested that plaintiff may need to join an ACCESS house for stabilization. (*Id.*). On November 21, 2014, plaintiff returned and indicated that she was receptive to ACCESS. (AR 432). Ms. Mohr noted that plaintiff's appearance and behavior were generally within normal limits. (*Id.*). When plaintiff returned on November 25, 2014 to further discuss ACCESS, Ms. Mohr noted that her grooming and hygiene were disheveled, that plaintiff appeared to have not showered, and she had toothpaste chalk over her mouth. (AR 432–33). During her clinical assessment on that same day with Suzanne Schuler, CPS, plaintiff reported irrational thoughts, including fleeting thoughts of self-harm by cutting. (AR 487–88). Ms. Schuler concluded that plaintiff did not meet the criteria for hospitalization, but that plaintiff would consider ACCESS. (AR 490).

On January 17, 2015, Ms. Mohr conducted her first quarterly review of plaintiff's condition which included a diagnosis of recurrent major depressive disorder in the moderate range and obsessive compulsive disorder with poor insight. (AR 516–24). Ms. Mohr noted that plaintiff's reported symptoms were worsening and that she had considered hospitalization. (AR 521). Ms. Mohr also noted that plaintiff had engaged in erratic and impulsive spending, which she only stopped when she was caught. (*Id.*). Ms. Mohr concluded that plaintiff had made minimal progress towards her goals largely due to her unwillingness to take her medication, and was at risk for ongoing crisis, hospitalization, and homelessness without ongoing support and intervention. (AR 522–23). On February 11, 2015, plaintiff returned for an assessment during which she stated that due to the stress she felt, she was ready to start taking her medication, but needed help in order to do so. (AR 525). Plaintiff complained that she was unable to work and complete tasks, and had been avoiding appointments due to her symptoms, which included panic

attacks induced by her grandmother's hospitalization. (*Id.*). Ms. Millman noted that plaintiff had adequate hygiene but appeared disheveled and had ruminative thoughts. (AR 526–27).

On April 19, 2015, plaintiff returned for a quarterly review. (AR 536–44). Ms. Mohr found that plaintiff remained non-compliant in taking her medication and was making excuses, claiming that her medication was making her health suffer. (AR 541). Ms. Mohr also found that plaintiff's symptoms had not improved due to her non-compliance, and that she remained paranoid and highly compulsive in her thinking. (*Id.*). Ms. Mohr concluded that plaintiff was struggling with managing her physical, mental, and medical well-being due to her resistance to taking medication, and that plaintiff recognized that hospitalization was an option because plaintiff required personal administration of her medication, support, and a strict regimen. (AR 541–42). On April 27, 2015, plaintiff reports having taken Celexa since her last appointment but not Seroquel but is considering taking it. (AR 551).

On July 6, 2015, plaintiff returned for a follow-up with Ms. Millman and represented that she started taking Seroquel, but limited its use to when she had not slept for days. (AR 1029). Plaintiff stated that her mood had improved from her previous appointment and that she was motivated to take on therapy to target her anxiety. (*Id.*). Plaintiff also noted that she had run out of Celexa and was prescribed additional medication. (*Id.*) On that same day, Ms. Mohr noted that plaintiff and her mother continued to "pose a level of resistance" to taking medication. (AR 1068). On July 20, 2015, Ms. Mohr completed a quarterly review of plaintiff's condition, again finding that plaintiff was resistant to taking her medication and was unable to recognize the importance of medication compliance despite her symptoms. (AR 1079). Ms. Mohr also found that plaintiff was unsuccessful in managing her symptoms on her own which led to her feeling

down, self-defeated, and unmotivated, and continued to suffer from a moderate impairment in her community life functioning. (AR 1081).

On July 27, 2015, Ms. Mohr completed a medical assessment of plaintiff's mental status. (AR 553–55). Ms. Mohr opined that plaintiff's depression and OCD led to appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and paranoid thinking. (AR 553). Ms. Mohr also noted that plaintiff had an irrational fear of consuming fibers in the air and experienced these symptoms twice per week. (AR 554). Ms. Mohr also opined that plaintiff had marked difficulties in maintaining social functioning due to her heavy reliance on social media to maintain a social network and had deficiencies in concentration, persistence, and pace, resulting in a frequent failure to complete tasks in a timely manner. (AR 555). Ms. Mohr concluded that plaintiff would have to miss work about twice per month as a result of her mental health symptoms. (*Id.*). Ms. Mohr also completed an ability to do work-related activities assessment, finding that plaintiff had a "good" ability to follow work rules, relate to co-workers, deal with the public, and interact with supervisors; a "fair" ability to deal with work stress, function independently, and maintain attention/concentration; and a "poor" or no use of judgment. (AR 556). Ms. Mohr indicated that plaintiff had a fair ability to understand, remember, and carry out complex, detailed, and simple job instructions but would have difficulty with multitasking. (AR 557).

Plaintiff continued speaking with Ms. Mohr from July 2015 to October 2015. (AR 991–1005). During her visits and telephone conversations, plaintiff's behavior was generally observed to be within normal limits, though she frequently reiterated her unwillingness to take her medication despite changes in her symptoms. (*Id.*). On August 20, 2015, plaintiff reported

11

that her ongoing OCD symptoms were "getting really bad." (AR 993). On September 16, 2015, plaintiff stated that she began to "freak out" while in the shower and was not able to leave her house following this incident. (AR 996). Plaintiff also stated that she was "unsure" if she will take medication at all because she was unable to afford it. (*Id.*). On October 2, 2015, plaintiff complained that she felt that she was "not doing well," and had begun "freaking out," crying, and couldn't leave the house. (AR 999). Plaintiff also refused to join ACCESS because she "[didn't] want to do chores," but stated that she was willing to consider hospitalization. (AR 999–1000). On October 13, 2015, plaintiff stated that she planned on being assessed for hospitalization by emergency services, and would likely be seen by the INOVA Fairfax Hospital. (AR 1003). On October 20, 2015, Ms. Mohr completed a quarterly review of plaintiff's condition, finding that plaintiff's OCD symptoms had increased, placing her at risk for hospitalization due to her inconsistencies with medication. (AR 1014). Ms. Mohr also found that plaintiff continued struggling with managing her physical, mental, and medical well-being, and continued to suffer from a moderate impairment in her community life functioning. (AR 1014–15).

On October 30, 2015, Joseph Burgus, CPS, QMHP, completed a preadmission screening report for voluntary inpatient hospitalization. (AR 969–83). In that report, plaintiff stated that she had "fairly regular" suicidal ideations which had progressed to the point where she considered a plan, but did not have the intent to commit suicide. (AR 971). A mental status exam was largely within normal limits, and plaintiff appeared well-groomed and composed, alert, but depressed. (AR 975). Plaintiff represented that she had followed her recommended recovery plan. (AR 977). Plaintiff was then hospitalized at the INOVA Fairfax Hospital from October 30, 2015 to November 10, 2015. (AR 560). Plaintiff was admitted with a GAF score of 11–20, indicating "some danger of hurting self or others possible OR occasionally fails to

maintain minimal personal hygiene OR gross impairment in communication," which improved to a score of 41–50 at discharge, indicating "serious symptoms." (*Id.*). During her stay, plaintiff received medication for her OCD as well as group therapy. (AR 561). The discharge notes state that plaintiff resisted discharge for several days despite appearing relaxed and socializing with other patients and staff "all day each day," before surprising staff by claiming that she was too anxious to be discharged. (*Id.*). A psychiatric examination revealed largely normal results, including the absence of suicidal ideation, voices, or evidence of psychosis. (AR 562). Plaintiff was discharged with a list of medications. (AR 563). The discharge notes from a subsequent hospitalization stated that plaintiff was malingering during this hospitalization and was not symptomatic towards the end of her stay, and stopped taking medication almost immediately upon discharge, claiming that she was afraid of her medication. (AR 574, 579).

On the day of her discharge from the INOVA Fairfax Hospital, plaintiff returned to the Arlington County Department of Human Services for a crisis stabilization screening. (AR 956–62). During the screening with Dr. Peter Frecknall, plaintiff was observed to be calm, lucid, and oriented, and denied any meaningful risk of harm, hallucinations, or substance abuse. (AR 956–57). However, plaintiff reported fleeting suicidal ideations, including a plan to superficially "scratch the surface of her forearm with a plastic fork," which she acted on two days prior. (AR 957). In a referral form for a Program of Assertive Community Treatment (PACT) completed that same day by Ms. Mohr, plaintiff was recommended to receive a higher level of supervision for her OCD symptoms, including a group home setting. (AR 961). Ms. Mohr also noted that plaintiff was willing to go to ACCESS after discussing the matter with a clinician at the INOVA Fairfax Hospital. (AR 1161).

Plaintiff was seen by Ms. Mohr and other staff at the Arlington County Department of Human Services throughout November 2015 to January 2016. (AR 1161–73). During her visits and telephone calls, plaintiff's behavior was generally within normal limits. (*Id.*). On November 12, 2015, Ms. Mohr reached out to plaintiff at her ACCESS house. (AR 1162–63). Plaintiff stated that she was taking her medication to aid in the management of her symptoms, but complained that the medication was not helping. (AR 1162). During an individual therapy session on November 17, 2015, plaintiff reported that she had attempted to hurt herself by cutting her arm with a plastic knife. (AR 1163–64). On November 24, 2015, plaintiff stated that she continued to have intrusive thoughts in her head, had stopped taking her Seroquel for two days, and was placed on a new antipsychotic medication at ACCESS. (AR 1164–65). Ms. Mohr expressed concern regarding plaintiff's ability to manage her everyday tasks and activities of daily living, including taking her medication. (AR 1165).

On December 3, 2015, plaintiff informed Ms. Mohr that her mother was preventing her from picking up her medication, and that she had not taken her medication for the past 3–4 days. (AR 1166). Plaintiff also remained preoccupied with her fear of particles in the air killing her. (*Id.*). On December 17, 2015, plaintiff's mother stated that plaintiff remained non-compliant with her medication, and as a result her OCD symptoms were worsening. (AR 1170). Plaintiff also refused to return to ACCESS, but stated that she felt she would need to be hospitalized again if she could not manage her medication. (*Id.*). On January 13, 2016, plaintiff stated that she had engaged in excessive spending and hypersexual behavior with others and remained non-compliant with her medication. (AR 1172). On January 20, 2016, Ms. Mohr completed a quarterly review of plaintiff's condition, noting that plaintiff was compliant with her medication while at the INOVA Fairfax Hospital and at ACCESS, and that plaintiff was considering a

14

second hospitalization. (AR 1175–85). Ms. Mohr also found that plaintiff had been unsuccessful in managing her symptoms on her own, including being non-compliant with her medications, which led to her feeling down, self-defeated, and unmotivated, and continued to suffer from a moderate impairment in her community life functioning. (AR 1182–83).

Plaintiff continued to attend sessions and have contact with Ms. Mohr and other staff at the Arlington County Department of Human Services throughout February 2016 and March 2016. (AR 1373–85). During her visits, plaintiff's appearance and behavior were generally within normal limits, though she frequently reiterated her unwillingness to take her medication despite changes in her symptoms. (*Id.*). On February 2, 2016, plaintiff stated that her anxiety and panic had gotten so much worse that she was feeling physically ill, and that she was getting sicker every day. (AR 1373). On February 4, 2016, plaintiff again stated that her symptoms were worsening, that she has not been taking her medication, and that she felt she needed to be hospitalized. (AR 1374–75). On February 11, 2016, plaintiff reported that she was binge eating, couldn't think things through, could barely take care of herself, and was "suffering a lot." (AR 1376). On February 12, 2016, plaintiff reported that she had been engaging in skin picking, excessive washing and scratching, binge eating, poor activities of daily living, and had not showered for five days or more. (AR 1376–77). On February 22, 2016, plaintiff stated that she had difficulty making decisions, she was suffering from panic attacks, she was not compliant with her medications, but she felt that she could still work. (AR 1378).

On February 24, 2016, plaintiff was referred to the Job Avenue program and submitted a screening form wherein Yen Le, the staff member working with plaintiff, indicated that plaintiff's goal of finding supported employment was feasible. (AR 1139–41). On March 2, 2016, plaintiff told Ms. Mohr that she was extremely worried about herself and was experiencing

increased panic attacks daily and at times wanted to hurt herself. (AR 1380). On that same day, Dr. John Palmieri conducted a psychiatric review of plaintiff and noted that she remained resistant to taking her medication, had suicidal thought content, paranoid thinking, and somatic preoccupation, but was otherwise within normal limits. (AR 1120–29). Dr. Palmieri noted that plaintiff's hygiene was adequate and she was cooperative, but that her thought process was tangential and contained ruminative thoughts. (AR 1122–23). Dr. Palmieri concluded that plaintiff was markedly ill, her condition had gotten minimally worse, and she never adhered to her medication treatment plan. (AR 1127). On March 8, 2016, plaintiff reported that she had a screening/assessment with Job Avenue and believed that it could help her, and that she would like to consider working. (AR 1381). On March 17, 2016, plaintiff told Ms. Mohr that she was not doing well, continued to feel sick, and did not show up to her appointment with Job Avenue. (AR 1383). Plaintiff stated that she planned to enter hospitalization on March 18, 2016. (*Id.*).

On March 18, 2016, plaintiff went to emergency services seeking assistance with voluntary hospitalization. (AR 1115–17). Plaintiff noted that she was completely off her medication, she was having 5–7 panic attacks per day, and the onset of hallucinatory activity, specifically seeing "something" on a cue-tip and worrying that she had inhaled it. (AR 1115). Plaintiff declined ACCESS and other less-restrictive treatment options and she was provided with a cab voucher to INOVA Fairfax Hospital. (AR 1117). Plaintiff began her second voluntary hospitalization at the INOVA Fairfax Hospital on March 18, 2016 and she was discharged on March 25, 2016. (AR 571–80). An intake notation dated March 19, 2016 indicates that plaintiff reported that she should not have stopped taking her medications and she is now feeling 10 times worse than before. (AR 597). On the day of her discharge, plaintiff underwent a mental status examination which was largely normal, finding that plaintiff had good

hygiene and grooming, was calm and cooperative, and had a coherent and logical thought process. (AR 578–79). However, plaintiff reported that she was seeing animals, though the discharging physician described this claim as "very vague," and found that "she really seems to be feigning this claim of seeing gigantic animals." (AR 579). The discharge notes also stated that plaintiff was told at the time of admission that the bulk of patient's treatment would be outpatient treatment and it would be up to her to be responsible and to go to appointments and take her medication. (*Id.*). The discharging physician also found that on discharge, plaintiff had good hygiene and grooming; was calm and cooperative; was in a good/better mood; had a coherent, logical, goal-oriented thought process; did not have delusional, suicidal, or homicidal thought content; had fair insight and judgment; and had intact orientation, memory, and attention and concentration. (AR 578–79).

On April 1, 2016, plaintiff met with Dr. Opal Pettis at Kaiser Permanente to establish psychiatric care. (AR 678). Dr. Pettis noted that plaintiff was very resistant to taking her medication but she indicated a willingness to work on being compliant, and she was prescribed Risperdal, Trazodone, and Lexapro. (AR 678–79). Plaintiff continued with treatment at Arlington County Department of Human Services with Ms. Mohr and other staff during April 2016. (AR 1095–99). During these visits and contacts, plaintiff stated that she was continuing to seek employment and her behavior was generally within normal limits, but she continued to be non-compliant with her medication. (*Id.*). On April 15, 2016, plaintiff stated that her OCD continued to worsen and she reported paranoia about her dog's health. (AR 1098). On April 19, 2016, plaintiff's mother reported that "things are going much better" because plaintiff had been taking her medication, but plaintiff reported she have not been compliant. (*Id.*). On April 21, 2016, Ms. Mohr completed a quarterly review of plaintiff's condition noting that plaintiff stated

she was happy with the decision to be hospitalized in March but indicated that plaintiff had been unsuccessful in managing her symptoms on her own and continued to suffer from a moderate impairment in her community life functioning. (AR 1109–11).

On April 25, 2016, plaintiff discussed with Ms. Mohr transferring to PACT for higher need services. (AR 906). Ms. Mohr noted that plaintiff was not taking 2 of 3 medications she had been prescribed. (*Id.*). On April 26, 2016, plaintiff appeared for a psychiatric review with Dr. Sahar Awad, her treating psychiatrist. (AR 1358–67). Dr. Awad indicated that plaintiff was not taking any medication at the time and presented with anxious mood, distorted turbulent personality with obsessionality and paranoia. (AR 1358). Dr. Awad prescribed Lexapro, Risperdal, and Trazodone and reiterated the importance of taking medication regularly. (AR 1358, 1366). Plaintiff returned to Dr. Awad for follow-up appointments on May 4, 10, and 17, 2016. (AR 1313–43). On May 4, 2016, Dr. Awad observed that plaintiff had taken her medication for the seven days prior, as reported by the PACT team supervising her. (AR 1334). Plaintiff reported feeling anxious, obsessive, and paranoid, and "seeing stuff in the carpet." (*Id.*). Dr. Awad increased the dosage of plaintiff's medication and found that plaintiff was among his most extremely ill patients, had no change to her condition, and was mostly adhering to her medical treatment plan. (AR 1334, 1341). On May 10, 2016, plaintiff reported feeling anxious, having intrusive thoughts, experiencing paranoia, and seeing dirt spots. (AR 1324). Plaintiff initially refused to take Risperdal, but ultimately agreed to take a higher dose. (*Id.*). Dr. Awad also prescribed Klonopin to treat plaintiff's anxiety. (*Id.*). At a home visit on May 17, 2016, plaintiff reported that she was "anxious, tired, not able to concentrate" but was doing better overall, though she was unable to fill her Klonopin prescription. (AR 1313).

On May 25, 2016, Job Avenue closed plaintiff's casefile, finding that plaintiff was not psychiatrically stable enough to work on securing employment. (AR 917). Plaintiff returned for medical assessments with Dr. Awad on June 6 and 20, 2016 during which Dr. Awad found that plaintiff was anxious, tired, and not able to sleep, and was not taking her medication as prescribed, including taking Lexapro in the evening rather than the morning, and not taking Klonopin. (AR 1297). Plaintiff stated that her OCD had mildly improved, and on June 20, 2016 she stated that she would like to work again. (AR 1284, 1297). During the June 20, 2016 visit, Dr. Awad again indicated that plaintiff was among his most extremely ill patients, her condition had minimally improved, and she was sometimes adhering to her treatment plan. (AR 1292).

On June 20, 2016, Dr. Awad conducted a medical assessment of plaintiff's mental status. (AR 660–62). Dr. Awad found that plaintiff had depressive syndrome characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (AR 660). Dr. Awad also found that plaintiff had marked restrictions on activities of daily living due to a lack of energy and intrusive thoughts several times a week; marked difficulties in maintaining social functioning due to those intrusive thoughts; deficiencies in concentration, persistence, or pace resulting in a frequent failure to complete tasks on time due to disorganized thoughts, lack of concentration, and anxiety; and repeated episodes of deterioration or decompensation in work or work-like settings causing plaintiff to withdraw from that situation, evidenced by plaintiff's hospitalizations in the past year. (AR 661–62). Dr. Awad concluded that plaintiff would be unable to attend work at least three times per month as a result of these limitations. (AR 662). Dr. Awad also completed an ability to do work-related activities assessment where he found that plaintiff had a "fair" ability to relate to co-workers, deal with the

public, and interact with supervisors; but had a "poor" or no ability to follow work rules, use judgment, deal with work stresses, function independently, or maintain attention/concentration. (AR 663).

Plaintiff returned for follow-up appointments with Dr. Awad on July 8, 13, and 20, 2016. (AR 924–41, 1238–66). On July 8, 2016, Dr. Awad noted that plaintiff had missed two days of Lexapro, and plaintiff stated that she had another panic attack due to "the dirt image" in her head. (AR 1256). On July 13, 2016, Dr. Awad noted that plaintiff appeared better and was less anxious, and plaintiff stated that taking Klonopin and Risperdal helped reduce her anxiety. (AR 1238). On July 20, 2016, Dr. Awad noted that plaintiff's OCD, depression, and anxiety symptoms had improved, though plaintiff reported residual symptoms of intrusive thoughts and ritualistic behavior. (AR 924).

On July 26, 2016, plaintiff spoke with Hanna Belachew, her new case manager at the Arlington County Department of Human Services, and reported that she was not doing well, was experiencing increased symptoms of OCD and anxiety, and had missed her dose of Lexapro that morning. (AR 1477).[5] Plaintiff followed-up with Dr. Awad on August 3, 2016 and reported that her mood and anxiety had improved, and that she was no longer crying as she did before. (AR 876–93). Dr. Awad noted that plaintiff wanted to stop taking Risperdal due to the side effects and they discussed Latuda to address her symptoms of psychosis/paranoia. (AR 876). On August 16, 2016, Dr. Awad found that plaintiff had stopped taking Latuda and was experiencing worsening intrusive thoughts, washing, and checking, and restarted her on Risperdal. (AR 851).

On August 17, 2016, plaintiff spoke with Ms. Belachew and reported feeling anxious and overwhelmed with some intrusive thoughts. (AR 1480). Plaintiff also reported passive suicidal

---

[5] On July 27, 2016, plaintiff met with Yen Li to review her applications to work and Giant and Safeway stores but later indicated she was not ready to work and it would jeopardize her SSDI application. (AR 1477–78).

ideation with no specific plan. (*Id.*). On September 2, 2016, plaintiff reported symptoms of paranoia secondary to intrusive thoughts, including fear that she "ate some black thing" that was on top of her snack bar. (AR 1481). On September 7, 2016, plaintiff again reported passive suicidal ideation, stating that she had a small knife in her purse in order to remind herself that she had the means to harm herself, but that she was not going to. (*Id.*). Plaintiff then stated that she had the knife in order to get her parents' and Ms. Belachew's attention, and could not decide whether to go to the hospital. (*Id.*). Ms. Belachew concluded that plaintiff was not in imminent danger of hurting herself or others. (*Id.*).

On September 13, 2016, plaintiff stated that she had superficially scratched her right upper arm with the knife in her purse, prompting Ms. Belachew to accompany plaintiff to Emergency Services for assessment and possible placement. (AR 1482–83). Plaintiff was seen at ACCESS crisis stabilization and assessed for worsening stress, anxiety, and self-harm in the form of superficial cuts to her wrist. (AR 810). Plaintiff stated that she was concerned her medication was not working, and that her diagnoses were incorrect. (*Id.*). Ms. Millman noted that plaintiff was well groomed, good eye contact, and less ruminative than before. (*Id.*). On September 15, 2016, ACCESS staff informed Ms. Schuler at Arlington County Department of Human Services that plaintiff was doing okay, participating in the program, and taking her medication without resistance. (AR 1484). However, at the same time plaintiff reported that she was very emotional and tearful, claiming that she was getting worse and wanted to go to a hospital instead. (*Id.*). On September 16, 2016, plaintiff informed Ms. Belachew that she had transferred to the Adventist Hospital in Maryland. (AR 1484–85). On September 20, 2016, plaintiff told Ms. Belachew that she was not feeling any better but told the doctor she was doing "okay" in order to get discharged home. (AR 1485).

On September 21, 2016, plaintiff returned to Dr. Awad for a follow-up appointment. (AR 791–809). Dr. Awad found that plaintiff had intrusive thoughts and anxiety, but denied any urges of self-harm. (AR 791). Plaintiff also stated that she did not take Risperdal the night before. (*Id.*). Dr. Awad noted that plaintiff's depression had improved despite an increase in stress at home. (AR 802). On September 28, 2016, plaintiff returned stating that she felt she was doing better, had not experienced a panic/anxiety attack recently, and her intrusive thoughts and hand washing were less prominent. (AR 1523). Dr. Awad found that plaintiff's OCD/anxiety and depression had both improved. (AR 1534). Plaintiff returned on October 12, 2016 complaining of intrusive thoughts, anxiety, and excessive handwashing. (AR 1503). Plaintiff stated that she was not taking her medication daily and had missed the past couple days. (*Id.*).

On October 20, 2016, Ms. Belachew conducted a quarterly review of plaintiff's condition. (AR 1491–1500). Ms. Belachew noted that plaintiff had not been taking her medication regularly, impeding her goal of reducing or eliminating compulsive behaviors. (AR 1497). On October 25, 2016, plaintiff returned for a follow-up with Dr. Awad reporting intrusive thoughts, anxiety, and daily panic attacks. (AR 1457). Plaintiff also stated that her mood was good, she was doing better, sleeping well, eating well, and no longer crying like she used to. (*Id.*). Plaintiff stated that she was inconsistent about taking her medication due to feeling better or forgetfulness. (*Id.*). Dr. Awad found that plaintiff's OCD/anxiety, depression, and intrusive thoughts had improved, that she was a moderately ill patient, her condition was much improved, and she was sometimes adhering to her treatment plan. (AR 1468–69).

On November 2, 2016, plaintiff told Ms. Belachew that she had not been taking her medication as prescribed because she did not feel better taking the medicine. (AR 1388). On November 9, 2016, plaintiff returned for a follow-up with Dr. Awad and stated that she was not

taking Klonopin anymore because it worsened her anxiety. (AR 1430). Dr. Awad found that plaintiff's depression had improved, that she was severely ill, her condition was minimally improved, and she was mostly adhering to her medication treatment plan. (AR 1441–42). On November 22, 2016, plaintiff returned stating that she was doing "a little bit better" and wasn't showering or washing her hands that much, but still "freak[ed] out" when she saw "dirt or something floating." (AR 1410). Plaintiff also stated that she was taking Klonopin as needed. (*Id.*). Dr. Awad noted that plaintiff was clean, cooperative, had a goal-directed thought process, and had attention/concentration within normal limits. (AR 1418–20). Dr. Awad found that plaintiff's depression had improved, that she was severely ill, her condition was minimally improved, and she was mostly adhering to her medication treatment plan. (AR 1422–23). On December 6, 2016, plaintiff returned to Dr. Awad and stated that Effexor was helping with her panic attacks and mood, and that while she still became anxious at the sight of dirt, she was generally doing better. (AR 1393). Plaintiff also reported that she was taking her medication daily. (*Id.*). Dr. Awad noted that plaintiff was clean, cooperative, had a goal-directed thought process, and had attention/concentration within normal limits. (AR 1397–99). Dr. Awad found that plaintiff's OCD/anxiety and depression had improved, that she was among his most extremely ill patients, her condition was much improved, and she was mostly adhering to her medication treatment plan. (AR 1401–02).

### D.    The ALJ's Decision on May 30, 2017

Determining whether an individual is eligible for DIB and/or SSI requires the ALJ to employ a five-step sequential evaluation. It is this process the court must examine to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See* 20 C.F.R. § 404.1520. Specifically, the ALJ must consider whether a plaintiff: (1) is currently engaged in substantial gainful employment; (2) has

23

a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform her past relevant work; and (5) if unable to return to past relevant work, whether plaintiff can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 (DIB); 416.920 (SSI). When considering a claim for DIB, the Commissioner must determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the Social Security Administration also provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

Here, the ALJ made the following findings of fact: (1) plaintiff met the insured status requirements of the Social Security Act through March 31, 2015; (2) plaintiff had not engaged in substantial gainful activity since May 1, 2011, the alleged onset date; (3) plaintiff had the following severe impairments: depressive disorder, anxiety disorder, obsessive-compulsive disorder, and learning disorder; (4) plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (5) plaintiff had the residual functional capacity to perform medium work, but was limited to simple, routine, repetitive tasks, and she could tolerate occasional changes in the work setting, but could have no production rate for pace of work, and could tolerate occasional interaction with the general public and co-workers. (AR 14–22). The ALJ then found that: (6) plaintiff was unable to perform any past relevant work; (7) plaintiff was born in 1981 and was 30 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date; (8) plaintiff had at least a high school education and was able to

communicate in English; (9) transferability of job skills was not an issue in this case because

plaintiff's past relevant work was unskilled; and (10) considering plaintiff's age, education, work

experience, and residual functional capacity, there were jobs that existed in significant numbers

in the national economy that plaintiff could perform. (AR 22–24). The ALJ concluded that: (11)

plaintiff had not been under a disability, as defined in the Social Security Act, from May 1, 2011,

through the date of the decision. (AR 24).

## IV.    ANALYSIS

### A.    Overview

Plaintiff's motion for summary judgment argues that the ALJ improperly discredited

mental health sources of record and omitted numerous consistent and well-supported functional

limitations in deciding the plaintiff's mental residual functional capacity. (Docket no. 14 at 6–

12).[6] Plaintiff makes two related contentions: (1) the ALJ improperly evaluated the opinions of

the state agency psychologists at the initial and reconsideration levels; and (2) the ALJ

improperly evaluated the opinions from her treating doctor, Dr. Awad, and her professional

counselor, Ms. Mohr. (Docket no. 14 at 6–12). In response, the Commissioner argues that: (1)

substantial evidence supports the ALJ's residual functional capacity assessment; (2) the ALJ

appropriately weighed the opinions of the state agency psychologists; and (3) the ALJ properly

evaluated the opinions of Dr. Awad and Ms. Mohr. (Docket no. 17 at 11–16).

### B.    Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Residual Functional Capacity

Residual functional capacity is "the most [a plaintiff] can still do despite [his or her]

limitations" and is to be assessed "based on all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(1). If the first three steps of the sequential disability evaluation do not lead

---

[6] Plaintiff does not dispute any of the ALJ's findings in steps 1, 2, and 3 of the five-step analysis.

to a disability determination, the ALJ must determine an individual's residual functional capacity and apply it to steps four and five. *Mascio*, 780 F.3d at 635. Here, the ALJ found that plaintiff had the residual functional capacity to perform medium work subject to additional limitations: plaintiff was limited to simple, routine, repetitive tasks; no more than occasional changes in the work setting; no production rate for pace of work; and no more than occasional interaction with the general public and co-workers. (AR 18–22).

In setting forth a residual functional capacity assessment, the Fourth Circuit held that remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Moreover, remand may be appropriate where the ALJ's opinion lacks "the analysis needed for [the court] to review meaningfully those conclusions." *Id.* at 636–37. Accordingly, the ALJ is required to engage in a thorough discussion of all evidence, including contradictory evidence, such that a court can engage in meaningful review.

In this case, the ALJ engaged in a thorough discussion of the relevant evidence in the record, considering the objective medical evidence alongside plaintiff's subjective statements. (AR 15–22). In arriving at his residual functional capacity assessment, the ALJ assigned different weights to the evidence in the record and adequately explained his rationale for those determinations. As explained in detail below, the ALJ provided a sufficient record for judicial review to justify his evaluation of the opinions of the state agency psychologists, Ms. Mohr, and Dr. Awad; the ALJ provided a sufficient record to support his residual functional capacity assessment; and the ALJ's determinations are supported by substantial evidence.

*1.* *The ALJ Provided an Adequate Explanation for His Evaluation of the Opinions of the State Agency Psychologists*

Plaintiff first argues that the ALJ improperly evaluated the opinions of the state agency psychologists at the initial and reconsideration levels. (Docket no. 14 at 6–9). In their opinions, Dr. Leslie Montgomery (initial) and Dr. Jo McClain (reconsideration) reviewed the available medical evidence and plaintiff's written statements and found that plaintiff: (1) had a limited ability to understand and remember complex and detailed instructions but could be expected to understand and remember simple, one and two-step instructions (AR 84, 96); (2) would be able to perform only very familiar or extremely routine procedures, complete a normal workweek, make simple work-related decisions on an infrequent basis, and perform at a pace generally consistent with others with only a minimal need for accommodations on an infrequent basis (AR 85, 97); (3) would be able to interact with the public only for brief periods or infrequently, ask simple questions/request assistance only from well-known individuals, and maintain acceptable behaviors and hygiene except for infrequent occasions, but would be easily distracted and misled by others (*Id.*); and (4) would need assistance adapting to change, unless the change was infrequent or implemented gradually (AR 86, 97).

In his decision, the ALJ gave partial weight to the opinions of the state agency psychologists and stated:

> Both Dr. Montgomery and Dr. McClain opined that the claimant retains the ability to perform simple, unskilled work. The undersigned gave great weight to this portion of their opinions, as it is consistent with the examination notes throughout the record. As described above, the most recent examination notes consistently describe the claimant's memory and concentration as normal. Both Dr. Montgomery and Dr. McClain further opined that the claimant could only interact with the public infrequently. They opined that the claimant would benefit from a setting with only few co-workers in a well-spaced location. The undersigned gave little weight to this portion of their opinion, as it is inconsistent with the examination notes throughout the record. As

27

> described above, the claimant is frequently described as both pleasant and cooperative. Furthermore, she does not report any difficulty getting along with others.

(AR 21–22 (citations omitted)). Plaintiff argues that the ALJ failed to discuss or account for other limitations assessed by the state agency physicians, including limitations in decision making, accommodations, asking simple questions or requesting assistance, or occasionally dealing with inappropriate behavior or hygiene. (Docket no. 14 at 8–9). Plaintiff cites to *Mascio* in support of her argument, arguing that remand is appropriate because here, as in *Mascio*, the ALJ failed to address specific functional limitations, leaving the reader "to guess as to how the ALJ arrived at his conclusions." (Docket no. 14 at 8–9).

In *Mascio*, the ALJ found that the claimant was not disabled because while she could no longer perform past work, she could perform other work in the national economy. *Mascio*, 780 F.3d at 635. In holding that remand was appropriate, the Fourth Circuit found that the ALJ's opinion was "sorely lacking in the analysis needed for [the court] to review meaningfully [his] conclusions." *Id.* at 636–37. In particular, the court found that the ALJ failed to account for Mascio's mental limitations and did not provide any explanation for his decision to exclude those limitations in rendering a residual functional capacity assessment. *Id.* at 638. The court also remanded on the grounds that the ALJ "said nothing about Mascio's ability to perform [certain functions] for a full workday," which the court found "especially troubling because the record contain[ed] conflicting evidence as to Mascio's residual functional capacity—evidence that the ALJ did not address." *Id.* at 637. The Fourth Circuit noted two residual functional capacity assessments by state agency examiners which conflicted with each other, the former of which the ALJ discussed in some detail, and the latter "about which he said nothing." *Id.* The ALJ's assessment was more consistent with the latter assessment, and "[t]o make matters worse, the ALJ's discussion of [the former assessment] trails off right where he was poised to announce the

28

weight he intended to give it," thereby leaving the court "to guess about how the ALJ arrived at his conclusions on Mascio's ability to perform relevant functions." *Id.*

Pursuant to *Mascio*, the ALJ in this case was not required to specifically discuss each and every finding made by the state agency psychologists, as plaintiff suggests. Instead, the ALJ was required to provide, and did provide, adequate analysis for review including "conflicting evidence as to [plaintiff's] residual functional capacity." *Mascio*, 780 F.3d at 637. Plaintiff identifies two ostensibly conflicting opinions from the state agency psychologists: (1) "[plaintiff] would occasionally, meaning up to 1/3 of the workday, need 'accommodations'"; and (2) "[plaintiff] would, up to 1/3 of the workday, have issues with maintaining appropriate behavior or hygiene." (Docket no. 14 at 8). Plaintiff relies on the definition of "occasionally" provided for in SSR 83-10, where it is defined as "occurring from very little up to one-third of the time." (Docket no. 14 at 8 (citing SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983)). However, plaintiff's representations of the state agency psychologists' opinions are inaccurate, as they found: (1) plaintiff had "only minimal need for accommodations on an infrequent basis," (AR 85, 97) and (2) plaintiff would "maintain acceptable behaviors and hygiene except for infrequent occasions" (*Id.*). The state agency psychologists did not use the term "occasionally" in arriving at those opinions, and certainly did not define "occasionally" in the manner plaintiff does in her motion. Moreover, these opinions do not conflict with the ALJ's residual functional capacity assessment, which found that plaintiff is limited to "simple, routine, repetitive tasks" (AR 18) and are consistent with the ALJ's description of plaintiff's condition following her March 2016 hospitalization and her most recent examination notes indicating her general appearance as clean, her speech as normal, being calm and cooperative, and fair judgment. (AR 19–20).

Finally, as discussed above, the ALJ accounted for the conflict between his residual functional capacity assessment that plaintiff can tolerate "occasional interaction with the general public and co-workers," and the opinion of the state agency psychologists that "claimant would benefit from a setting with only few co-workers in a well-spaced location" by explaining that the record as a whole supported his assessment and was inconsistent with their opinion. (AR 18, 22). The ALJ engaged in a thorough discussion of the evidence in the record, noting plaintiff's subjective statements that she went out with friends twice a week, went shopping with her friends, purchased a cabin for her friends to spend a weekend in, and got along with her family members. (AR 20 (citing AR 51, 430)). The ALJ also noted that in her Function Report dated August 1, 2013, plaintiff stated that she had no difficulty getting along with family, friends, neighbors, or others, and got along "excellent" with authority figures. (AR 16 (citing AR 284–85)). The ALJ also considered and discussed the medical treatment notes in the record, finding that they repeatedly described plaintiff as pleasant and cooperative. (AR 16 (citing AR 484, 541, 578, 798, 818, 1122, 1162, 1244, 1259)). In addition, Ms. Mohr's assessment of plaintiff on July 27, 2015, indicated that plaintiff has a limited but satisfactory ability to work with co-workers and deal with the public. (AR 556). Accordingly, the ALJ provided adequate justification for his evaluation of the opinions of the state agency psychologists.

2.   *The ALJ Provided an Adequate Explanation for His Evaluation of the Opinions of the Dr. Awad and Ms. Mohr*

Plaintiff's second and final argument is that the ALJ improperly discredited the opinions of Dr. Awad, her treating physician, and Ms. Mohr, her treating counselor. (Docket no. 14 at 9–12). On July 27, 2015, Ms. Mohr completed a "Medical Assessment of Mental Status," opining that plaintiff had marked difficulties in maintaining social functioning due to her heavy reliance on social media to maintain a social network and had deficiencies in concentration, persistence,

30

and pace resulting in a frequent failure to complete tasks in a timely manner. (AR 555). Ms. Mohr also opined in her "Medical Assessment of Abilities to Do Work-Related Activities (Mental)" that plaintiff had a "good" ability to follow work rules, relate to co-workers, deal with the public, and interact with supervisors; a "fair" ability to deal with work stress, function independently, and maintain attention/concentration; and "poor" or no use of judgment. (AR 556). Ms. Mohr concluded that plaintiff would be unable to attend work about twice per month as a result of the limitations imposed by her mental impairments or treatment. (AR 555, 558).

One year later, on June 20, 2016, Dr. Awad completed a "Medical Assessment of Mental Status," opining that plaintiff had marked restrictions on activities of daily living due to a lack of energy and intrusive thoughts several times a week; marked difficulties in maintaining social functioning due to intrusive thoughts; deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks on time due to disorganized thoughts, lack of concentration, and anxiety; and repeated episodes of deterioration or decompensation in work or work-like settings causing plaintiff to withdraw from those situations. (AR 661–62). Dr. Awad also opined in his "Medical Assessment of Abilities to Do Work-Related Activities (Mental)" that plaintiff had a "fair" ability (serious limited but not precluded) to relate to co-workers, deal with the public, and interact with supervisors; but had a "poor" or no ability to follow work rules, use judgment, deal with work stresses, function independently, or maintain attention/concentration. (AR 663). Dr. Awad concluded that plaintiff would be unable to attend work at least three times per month as a result of the limitations imposed by her mental impairments or treatment. (AR 662, 665).

In his decision, the ALJ stated:

> The undersigned gave little weight to Ms. Mohr's opinions for three reasons. First, Ms. Mohr's opinions are inconsistent with the

31

examination notes throughout the record. While Ms. Mohr opines that the claimant experiences marked difficulties in the area of social functioning, her examiners frequently describe her as pleasant and cooperative. Furthermore, she sees friends approximately one or two times a week and reports a good relationship with her family members. Second, Ms. Mohr's opinions were formed in July 2015, before the claimant was more compliant with her prescribed medications. Third, Ms. Mohr did not have the opportunity to consider the entire medical record before forming her opinion.

(AR 21). The ALJ employed similar reasoning in giving little weight to Dr. Awad's opinions, finding that Dr. Awad's opinion that plaintiff "would be unable to complete tasks in a timely matter[sic]" was inconsistent with the record. (*Id.*). Plaintiff argues that: (1) the ALJ's allegation that the record is inconsistent with the opinions of Ms. Mohr and Dr. Awad is incorrect; (2) the ALJ did not explain how plaintiff improved since taking her medication; and (3) Ms. Mohr's and Dr. Awad's access to the entire record is but a single factor to consider and should not be determinative of the weight afforded to their opinions. (Docket no. 14 at 11–12).

The Fourth Circuit has repeatedly held that "it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). Generally, more weight is given to medical opinions from a claimant's treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's medical impairments, and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). However, an ALJ "may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th

Cir. 2014) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). For example, when a treating physician's opinions are not consistent with the record or supported by the medical evidence, it is appropriate for the ALJ to afford those opinions little or no weight. *Id.*

The ALJ provided an adequate explanation for his decision to afford little weight to the opinions of Ms. Mohr and Dr. Awad. First, the ALJ discussed the evidence in the record at length and found that it consistently contradicted the opinions of Ms. Mohr regarding the severity of the limitations on plaintiff's social functioning. (AR 15–22). The ALJ found that the evidence in the record indicated that while plaintiff "exhibits some paranoia during examinations," she "does not report any difficulty getting along with family, friends, or neighbors," gets along "excellent" with authority figures, and "is frequently described as both pleasant and cooperative." (AR 16 (citing AR 484, 541, 578, 798, 818, 1122, 1162, 1244, 1259)). On the basis of the cited evidence, the ALJ concluded that plaintiff would have "moderate difficulty interacting with other[sic]." (AR 16). Thus, the ALJ considered the evidence in the record and found that despite some conflicting evidence, the substantial evidence supported his residual functional capacity assessment rather than the more severe limitations opined by Ms. Mohr. (AR 21).

The ALJ also explained why the evidence in the record consistently contradicted the opinions of Dr. Awad regarding the severity of the limitations on plaintiff's ability to complete tasks in a timely manner. (AR 15–21). The ALJ noted that in her Function Report dated August 1, 2013, plaintiff reported difficulty understanding and following directions, but that this subjective claim was not borne out by the evidence in the record, which showed that plaintiff displayed the ability to follow in-clinic directions during her driving evaluation in April 2012, and was consistently found to have intact memory and fair insight and judgment during medical

appointments in 2016. (AR 15 (citing AR 284, 370, 1397–1400, 1418–21, 1437–40, 1464–67, 1510–13, 1532–33)). The ALJ also found that the evidence in the record indicated that plaintiff "can pay attention for an extended period of time" and found that "the recent examination notes describe her concentration as intact." (AR 16). Thus, the ALJ considered plaintiff's subjective statements along with the objective medical evidence and found that plaintiff had a moderate limitation with respect to her ability to understand, remember, and apply information rather than the more severe limitations on plaintiff's concentration, persistence, and pace opined by Dr. Awad. (AR 21).

Moreover, while plaintiff identifies some evidence in the record that supports the opinions of Ms. Mohr and Dr. Awad, including treatment notes revealing poor hygiene and a disheveled appearance on occasion, her symptoms of increased anxiety and liable mood, and her hospitalizations, the ALJ discussed that evidence and adequately accounted for it in finding moderate limitations rather than the more severe limitations opined by Ms. Mohr and Dr. Awad. For example, the ALJ noted that plaintiff was hospitalized when she was non-compliant with her medication, her symptoms improved with treatment, and she was found to be malingering and feigning visual hallucinations upon discharge. (AR 19 (AR 574, 578–79)). In addition, while plaintiff appeared with poor hygiene and a disheveled appearance during some of her early visits with Ms. Mohr (*See, e.g.*, AR 426–27, 432–33), the ALJ explained that the record indicates that, particularly during recent examinations, plaintiff was described accordingly: "(1) general appearance as clean; (2) speech as normal; (3) thought process as goal-directed; (4) affect as full range; (5) memory as intact; (6) concentration as intact; (7) behavior as cooperative; and (8) judgment as fair or good." (AR 19–20 (AR 578–79, 1397–1400, 1418–21, 1437–40, 1464–67, 1510–13, 1532–33)).

Second, the ALJ properly considered whether plaintiff's compliance with her medication improved her condition, finding that after plaintiff "indicated that she had grown in her acceptance of needing medication" and that when she began taking her medication more consistently, her symptoms began to improve, which the ALJ found "suggests that [plaintiff's] mental impairments are amenable to proper medical treatment." (AR 19–20). Moreover, plaintiff's claim that her non-compliance was "due to her problems with OCD" is not supported by the medical evidence or her testimony during the hearing. (Docket no. 14 at 11). Indeed, plaintiff testified that she started taking her medication regularly during the fall of 2016, and when the ALJ asked plaintiff why she hadn't been compliant before then, plaintiff answered that she "thought [she] could get better on [her] own – which wasn't the case." (AR 48). Plaintiff also testified that since she began taking her medication regularly, she "noticed it's been helping," had "been feeling a little bit better," and agreed that her symptoms were "not as bad as when [she's] not taking the medication regularly." (AR 49). As discussed in greater detail above, the treatment notes are consistent with this testimony and also demonstrate plaintiff's persistent non-compliance in taking her medication. (*See, e.g.*, AR 542, 574, 698, 810–12). Third, the ALJ discussed Dr. Awad's and Ms. Mohr's lack of access to the entire record as one of three reasons for his decision to afford their opinions little weight. (AR 21). Indeed, the ALJ only regarded it as "a single factor to consider" rather than the sole determinative factor in his analysis. (Docket no. 14 at 12). Accordingly, the ALJ provided a sufficient record for judicial review to justify his evaluation of the opinions Ms. Mohr and Dr. Awad.

The ALJ's residual functional capacity assessment is supported by substantial evidence in the Administrative Record, and the ALJ's decision provided an adequate record for judicial review. The ALJ discussed and analyzed the entirety of the relevant evidence in the record in

arriving at his residual functional capacity assessment. (AR 18–22). For example, the ALJ found that plaintiff's subjective statements, including that she suffered from "frequent panic attacks and crying spells . . . intermittent suicidal ideations . . . [and had] trouble understanding following instructions," were not entirely consistent with the medical evidence and other evidence in the record. (AR 18). The ALJ then provided a thorough discussion of the medical evidence in the record, including the conflicting opinion evidence offered by the state agency psychologists, Ms. Mohr, and Dr. Awad in finding that "[t]he objective medical evidence does not support the reported severity of the claimant's intellectual disability." (AR 18–20). As discussed in detail above, the ALJ explicitly considered conflicting evidence supporting more severe limitations and concluded that those opined limitations were not supported by the evidence in the record. Plaintiff has not identified any additional evidence which she claims the ALJ failed to consider, and a review of the entire record confirms that the ALJ's determination is supported by substantial evidence. Accordingly, the ALJ provided an adequate record for judicial review to justify his evaluation of the opinions of the state agency psychologists, Ms. Mohr, and Dr. Awad; the ALJ provided an adequate record to support his residual functional capacity assessment; and the ALJ's determinations are supported by substantial evidence.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision rendered on May 30, 2017—denying benefits for the period of May 1, 2011 through the date of the decision—is supported by substantial evidence. The court also finds that proper legal standards were applied when evaluating the evidence and determining the credibility of various medical sources. Accordingly, plaintiff's motion for summary judgment (Docket no. 13) is denied; the Commissioner's motion

for summary judgment (Docket no. 16) is granted; and the final decision of the Commissioner is affirmed.

Entered this 17 day of September, 2018.

/s/
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia